### BROOKS v. DICK et al.

*(Supreme Court, General Term, First Department. December 31, 1891.)*

RAILROAD COMPANIES—BONDS AND MORTGAGES—FORECLOSURE—REORGANIZATION.

A committee representing railway bondholders, after foreclosure of the mortgage securing their bonds, was authorized to exchange such bonds received by it for bonds of a new company, or of a consolidated company of equal value, and was also empowered to pay certain debts and liens from the bonds received by it on such exchange. *Held,* that this authorized the committee to contract with others for the cancellation and discharge of such indebtedness, and to devote a portion of the bonds so received to that purpose; and the fact that the committee could only exchange for bonds of equal value gave the bondholders no right to receive the same intact.

Appeal from special term, New York county.

Action by John Brooks against Robert B. Murray, Frederick W. Huidekoper, Richard Irwin, Lewis Walker, Francis Rawle, Frank Sullivan Smith, Samuel B. Dick, Arthur C. Huidekoper, and the Pittsburgh, Shenango & Lake Erie Railroad Company to set aside an agreement and to restrain the use of certain bonds. Judgment for defendants. Plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and BARRETT and ANDREWS, JJ.

*W. M. Safford,* for appellant. *Cecil Campbell Higgins,* (*C. Walter Artz,* of counsel,) for respondents.

ANDREWS, J. The plaintiff was the owner of $39,500 of first mortgage bonds of the Shenango & Alleghany Railroad Company. The defendants Murray and F. W. Huidekoper, Irwin Walker, and Rawle and Smith are a

committee appointed by and representing plaintiff and other bondholders, and having the powers conferred by the paper Exhibit A, attached to the complaint. Said committee entered into an agreement with the defendants Dick and A. C. Huidekoper, set forth in the paper Exhibit B, attached to the complaint. After the contract in said Exhibit B had been partially performed, the plaintiff brought this action; alleging in his complaint that the contract was *ultra vires* of the committee, and was executed in fraud of the rights of himself and other bondholders; and asked as relief that said contract should be annulled, and that an injunction should be granted restraining the delivery to the defendants Dick and A. C. Huidekoper of certain bonds. The defendants Dick and A. C. Huidekoper demurred to the complaint, on the ground that, as to them, it did not state facts sufficient to constitute a cause of action. This demurrer was sustained by the special term, and a judgment was thereupon entered dismissing the complaint as to those defendants, and from such judgment this appeal is taken.

It appears, by the opinion of the learned judge before whom the case was tried at special term, that the grounds of his decision were that the complaint did not show that the plaintiff would be injured if the contract in Exhibit B should be fully carried out; that the committee had authority to make the contract contained in said Exhibit B; that the defendants Dick and A. C. Huidekoper did not occupy a trust relation towards the plaintiff; and that, if the said contract was in fact injurious to the plaintiff, his only remedy was against the individuals composing that committee. The complaint in this case abounds in charges of fraud, conspiracy, and willful misconduct on the part of said committee; but it is well settled that such allegations in a pleading amount to nothing, unless accompanied by allegations of specific facts tending to sustain such general charges. Counsel for the plaintiff refers in his brief to two specific allegations of the complaint, which will be noticed hereafter, and then says: "But the complaint in this suit is drawn upon the theory that the contract Exhibit B is *ultra vires,* and that the committee had no power to make the contract; the fourth paragraph of the complaint averring that the plaintiff was induced to enter into the agreement in particular reliance upon the tenth paragraph of the agreement and power marked 'Exhibit A:' 'We authorize the committee to exchange the bonds to be received by it, as aforesaid, or any receiver's certificates or claims against the present railroad company or its property, or liens upon its property, which they may have purchased hereunder, or any indebtedness of the railroad company, for advances they may have made to it hereunder, for any mortgage bonds of the present railroad company, or any further consolidations thereof approved by them, the principal and accrued interest of which shall not be less than the principal and accrued interest of bonds given in exchange therefor;' and the complaint alleges that the said committee, well knowing the premises, and well knowing the reliance placed by the plaintiff upon such clause in said agreement, and willfully intending to disregard the same, and to deprive the plaintiff of his property, entered into the agreement marked 'Exhibit B,' wherein and whereby fully one-fourth of the whole trust-estate so far as the same was represented by bonds, and fully three-fourths of the whole trust-estate so far as the same was represented by stock, is transferred to Samuel B. Dick and Arthur C. Huidekoper. And the eighth paragraph of said complaint alleges that the agreement was made without authority by said committee, and is without the scope of the powers of said committee." So far as it is possible to understand the grievance of which the plaintiff complains, it is this: He was the owner of $39,500 of bonds, which passed into the control of the committee. He concedes that the committee had the right to exchange these bonds as they did for other bonds, but he contends that, by the terms of the agreement between the bondholders and the committee, he was to receive back an equal amount, that is to say, $39,500, of the bonds received

in exchange for his bonds; and, because the committee entered into a contract by which one-fourth of these bonds are to be used to pay off certain indebtedness of the company which issued the plaintiff's bonds, the committee has exceeded its powers. We do not think this claim of the plaintiff is well founded, but the only way in which the matter can be made clear is by a consideration in detail of the situation as it existed before the papers Exhibits A and B were executed, and of the contents of these papers themselves, taken in connection with the allegations of the complaint.

The mortgage given by the Shenango & Alleghany Railroad Company, to secure bonds of which the $39,500 held by plaintiff were a part, was foreclosed. Upon the sale the property was bought in by three individuals, Shryock, Fowler, and Whittridge, who were a committee of the bondholders. Subsequently this committee transferred and conveyed the property to the Pittsburgh, Shenango & Lake Erie Railroad Company, which thereupon issued $1,200,000 first mortgage bonds, and $1,200,000 of stock, for the purpose of paying for such property. Said bonds were hypothecated with the Central Trust Company to secure certain advances made by that company in the course of the foreclosure. The Pittsburgh, Shenango & Lake Erie Railroad Company was subsequently consolidated with two other companies, and $1,200,000 of the consolidated company's stock was issued to the committee in place of the $1,200,000 of stock which they had previously received. In this situation of affairs, the committee being desirous to be relieved from their trust, the bondholders appointed a new committee, and conferred upon that committee the powers contained in the said Exhibit A, attached to the complaint. By that paper the bondholders signing it united their interests in and to said bonds and stock into a common fund or estate, to be managed by said committee under the powers therein set forth. Those powers were to receive all said bonds and stocks, and to pay the advances for which said bonds were hypothecated, and interest, and all reasonable expenses incurred by the trustees, including charges of attorneys and counsel; to buy, either for cash or upon an agreement for benefits, payments, or securities, which the said committee could perform, the interest of any person not a party to the agreement, entitled upon distribution to any of said bonds and stocks held by the former committee, and to receive the same; to have all stocks received and transferred into their names, and to vote upon and to exercise all the rights and powers of stockholders upon and with respect to said stock, and to exercise all the rights of bondholders upon and with respect to all bonds received by them; to buy for the said common fund or estate any of the receiver's certificates, and any claims against the railroad company or its property, or liens upon any of its property, or any of the stock of said company; to make advances to the railroad company, to be used by it only to pay present debts, to remove liens, to compromise present claims against it or its property, to provide necessary equipment, or to complete construction; to employ attorneys and counsel to pledge or hypothecate any of the bonds, stocks, or other assets which should come into their hands, upon such terms as to them should seem wise, in order to raise money for any of the purposes for which expenditures were authorized; to exchange said bonds, or any receiver's certificates or claims against the railroad company, or its property, or liens upon its property, which they might have purchased, or any indebtedness of the company for advances they might make to it, for any mortgage bonds of said company, or any further consolidations thereof, approved by them, the principal and accrued interest of which should not be less than the principal and accrued interest of bonds given in exchange therefor, and the cost, with interest at 6 per cent., of all receiver's certificates, claims, liens, or indebtedness given in exchange; to bring about a sale of the property of the railroad company, or any part thereof, under a judgment of the court for the enforcement of any lien or liens, securities and bonds, certificates or other obligations held by the committee, and at

any such sale to purchase the property sold, and to organize a new corporation, to take it and convey the same to it, receiving bonds or stock or both therefor, as they might determine; and to sell the whole or any part of the common fund or estate. This paper was dated February 1, 1890; and thereafter, on August 13, 1890, the committee entered into the agreement, Exhibit B, of which the plaintiff complains. That agreement provides for the consolidation of the Pittsburgh, Shenango & Lake Erie Railroad Company with the Pittsburgh, Butler & Shenango Railroad Company. By the terms of this agreement, the consolidated company was to issue its stock, share for share, for the stock of the two companies, the Pittsburgh, Butler & Shenango Company receiving $500,-000, and the Pittsburgh, Shenango & Lake Erie Company receiving $2,500,-000. The consolidated company was also to issue new mortgage bonds upon the whole property, of which the Pittsburgh, Butler & Shenango Railroad Company was to receive $500,000 in exchange for $500,000 of its own bonds, and the committee was to receive $1,200,000 of such bonds in exchange for an equal amount of the bonds of the Pittsburgh, Shenango & Lake Erie Railroad Company, held by it. · Dick and A. C. Huidekoper (in the agreement called the "contractors") agreed to cause the Pittsburgh, Butler & Shenango Company to do all that might be necessary on the part of that company to perfect the consolidation and exchange of bonds; and the committee also agreed that it would, so far as it had power, cause the Pittsburgh, Shenango & Lake Erie Company to do the same. The contractors also agreed to cause all those who might have, but had not, come into the agreement under which the committee was acting, to come in so that the committee should represent all the stock and bonds of the Pittsburgh, Shenango & Lake Erie Company, formerly held by the previous committee. The contractors also agreed to put the Pittsburgh, Butler & Shenango Company in such condition that $500,000 of the stock and $500,000 of bonds should represent all interests of every kind therein, so that it should be free from debt, and its property free from liens. The contractors also agreed to purchase the receiver's certificates specified in Schedule A, attached to the agreement, and caused the same to be canceled, and to pay all the indebtedness specified in said Schedule A; also to discharge all debts of the Pittsburgh, Shenango & Lake Erie Railroad Company, and liens or clouds upon its property, set forth in Schedule B, attached to the agreement. The committee agreed that so soon as it should receive the bonds and stock of the consolidated company in exchange for the $1,200,000 of bonds, and $1,550,000 of stock, of the Pittsburgh, Shenango & Lake Erie Railroad Company, held by the committee, they would deliver to the contractors $480,000 of said bonds, and $907,100 of said stock, provided the contractors should have done everything they had agreed to do, except making the payments mentioned in article 2 of Schedule B. And it was further provided that, when the contractors should pay the claims mentioned in said article 2 of Schedule B, bonds of the consolidated company should be issued to them, upon proper vouchers showing the discharge of the various liens, debts, and clouds, to an amount equal, at 90 per cent. of the par value of the bonds, to the aggregate amounts of the said loans, debts, and clouds. Briefly stated, under this agreement, the committee was to do all in its power to bring about the proposed consolidation, and to pay the contractors $480,000 of bonds, and $907,100 of stock. Everything else was to be done by the contractors, and the delivery of such bonds and stock to the contractors was not to take place until they had fully performed their part of the agreement.

It is entirely clear, from a consideration of the provisions of said Exhibits A and B, that the claim of the plaintiff that he was to receive back his $39,-500 of bonds of the Pittsburgh, Shenango & Lake Erie Company, or an equal amount of the bonds of some other company, has no foundation whatever. It is true, as above stated, that among the powers conferred by Exhibit A upon the committee was the power to exchange the $1,200,000 of bonds held by

them for an equal amount of other bonds of the said last-mentioned railroad company, or any further consolidations thereof, and that is exactly what was done; for, in exchange for such $1,200,000 of bonds held by them, it is provided in Exhibit B that they shall receive $1,200,000 of bonds of the consolidated railroad. In view, however, of the situation of matters, and of the provisions of both Exhibits A and B, the claim that plaintiff and other bondholders were to receive intact the whole $1,200,000 of bonds, which should be received by the committee, in exchange for a like amount held by them, is preposterous; and if the plaintiff was acquainted with the contents of Exhibit A before he signed it, it is impossible to believe that he could have supposed when he signed it that he would receive back intact his $39,500, or an equal amount of some other bonds. It does not appear that the committee had any other property or funds, or the means of raising any money, except said $1,200,000 of bonds, and $1,200,000 of stock, in the old company. The claims against the Pittsburgh, Shenango & Lake Erie Railroad Company, and against the property bought by it from the first committee, and which were prior in right to the bonds held by the plaintiff and other bondholders, amounted to about $480,000. Other claims against the company, which were not prior in right to said bonds, but which it was necessary to pay for the protection of such bonds and stock, amounted, according to the statements in article 2 of said schedule, to about $365,000; and leaving out the Reid judgment, of $75,000, which was a disputed liability, the undisputed liabilities of this character amounted to nearly $300,000, and the committee had no means whatever of paying this undisputed indebtedness of nearly $700,000, except by disposing of a portion of the bonds and stock held by them. The claim, therefore, that the plaintiff, when he signed Exhibit A, expected to receive back his $39,500 of bonds, or an equal amount of other bonds, is entitled to no consideration whatever. Nor are we able, after a careful examination of the provisions of Exhibits A and B, to say that the committee, in entering into the contract in Exhibit B, in any manner exceeded their power. It was in contemplation of the parties when Exhibit A was executed that the Pittsburgh, Shenango & Lake Erie Company might be consolidated with some other road, because the tenth clause provided for the exchange of $1,200,000 of bonds "for any mortgage bonds of the present railroad company, or any further consolidation thereof approved by them." The right to exchange the $1,200,000 of bonds held by the committee was exercised, and under Exhibit B they were to receive a like amount of bonds of the consolidated road. We see no reason to doubt, moreover, that the committee had power and authority to transfer to contractors $480,000 of the bonds and $907,100 of the stock held by them. The committee was authorized by Exhibit A to buy and cancel the claims against the railroad enumerated in Schedule A and article 1 of Schedule B. They were also authorized to sell the whole or any part of the bonds and stock which they were to receive in exchange. They could have sold a portion of the bonds and stock to the contractors at a fixed price, and have used the money in paying off such liabilities. What they did do was, in effect, the same thing. The committee agreed that if the contractors would provide the means to pay off such liabilities, and perform certain services about the consolidation, which would be of advantage to the bondholders, they would convey to the contractors such $480,000 bonds and $907,100 of stock. What the value was of such of the bonds and stock to be so transferred to the contractors does not clearly appear. It may, however, fairly be inferred, from all the facts disclosed, that it is very much less than par. In the absence of fraud, however, it is immaterial what the value of such bonds and stocks was, so long as the committee had the authority, which they had, to transfer the same.

The only other points made by the learned counsel for the plaintiff in his brief relate to the item of the judgment of $75,000 and the item of $55,000 to

be paid to the American Exchange Bank, both of which appear in article 2 of Schedule B.    It is alleged in the complaint that the judgment never had any existence, and that F. W. Huidekoper, one of the committee, had an interest of $5,000 in such sum of $55,000.    It appears, however, by the eighth subdivision of Exhibit B, that the bonds to be used in paying the various claims mentioned in article 2 of Schedule B were not to come out of those transferred to the committee, but were to be issued and delivered to the contractors, upon proper vouchers showing the discharge of said liens, debts, and clouds.    We do not see how the plaintiff can maintain his action to restrain the payment of those items.    The bonds to provide for those items must necessarily be issued under the authority of the directors of the consolidated road; and, if plaintiff can maintain an action at all to prevent the payment of those items, it would seem that it must be brought against such directors.    Moreover, the bonds to pay the items mentioned in said article 2 of Schedule B are only to be issued upon proper vouchers, showing the discharge of such liabilities, and it cannot be assumed, in advance, that bonds will be issued to pay a judgment which has no existence, or a claim which is improper.    The presumption is that if the judgment does not exist, and it is improper to pay a claim in which F. W. Huidekoper has an interest, no vouchers can be presented which will lead to a delivery of bonds in payment of those items.    We are of the opinion that the judgment of the special term should be affirmed, with costs.    All concur.